UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

BRYAN and CORY ESTERLINE,        Case No. 05-40657
WILLIAM and PAMELA ESTERLINE, and    Case No. 05-40654
                                    Chapter 7
     Debtors.                       Hon. Marci B. McIvor
_____/

AUTO-OWNERS INSURANCE CO.,

     Plaintiff,

v.                                        Adv. No. 05-5197
                                       Adv. No. 05-5140

BRYAN M. ESTERLINE, and
WILLIAM J. ESTERLINE,

     Defendants.
_____/

## OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiff's Motion for Summary Judgment against Defendants. For the reasons set forth below, Plaintiff's motion is GRANTED in part and DENIED in part.

I.

FACTUAL BACKGROUND

Jewerel McGowan, III is an insured party under an automobile policy issued by Auto-Owners Insurance Company ("Plaintiff"). As a result of injuries sustained in an automobile accident, Mr. McGowan became a paraplegic. Plaintiff's Exhibit 5, Affidavit of

Richard J. Rollis, Jr., ¶ 4. Under the terms of his insurance policy, Mr. McGowan is entitled to certain living arrangements, namely a barrier-free home to accommodate his disability.

Bryan Esterline and William Esterline ("Defendants") are the principals of Esterline Construction and Development, Inc. ("Esterline Construction").[1] On April 8, 2003, Esterline Construction submitted a proposal to Plaintiff to build a modular house to accommodate Mr. McGowan's disability. The proposal sets forth the terms relating to the construction of the home but does not propose providing the real property upon which to place the house. The price for the work described in the proposal was $129,961.00.

On April 24, 2003, Plaintiff entered into a Home Modification Agreement (Plaintiff's Exhibit 6) with Mr. McGowan "to purchase Lot #1" and to "purchase, modify and construct a barrier-free home at the property", that being a then vacant lot located at 3020 West Carson Highway in Adrian Township in Lenawee County. Plaintiff's Exhibit 5, Affidavit, ¶ 5. Specifically, section 1 of the Home Modification Agreement provides in pertinent part:

> Auto-Owners Insurance Company [Plaintiff] shall jointly pay to Esterline Construction and Jeweral McGowan III the sum of One hundred twenty-nine thousand nine hundred sixty-one dollars and no cents ($129,961.00) **to purchase Lot #1** as described on the Certificate of Survey, which is attached to this agreement, in Adrian Township, Lenawee County, Michigan and **purchase, modify and construct a barrier free home at the property** described above for Jeweral McGowan III's present wheelchair status.

---

[1] Esterline Construction is a debtor in the separate Chapter 7 Bankruptcy Case, No. 05-4065-MBM, that was filed on the same day that the Esterline Defendants filed their bankruptcy petitions. A final decree closing the Esterline Construction bankruptcy case without distribution was issued on August 26, 2005.

(Emphasis added). Neither the Esterline Debtors nor Esterline Construction signed the Home Modification Agreement.

Although the Esterline Debtors did not sign the Home Modification Agreement, the Esterline Debtors were familiar with the terms of the Home Modification Agreement. Exhibit 1 attached to Plaintiff's Response, ¶ 3; Exhibit 2 attached to Plaintiff's Response. Esterline Construction was designated as the joint payee and builder in the Home Modification Agreement and could only receive a check to commence construction upon Plaintiff's receipt of a signed copy of the Home Modification Agreement. Exhibit 1 attached to Plaintiff's Response, ¶ 4. On April 24, 2003, Defendant Bryan Esterline arranged for Mr. McGowan to sign the Home Modification Agreement and faxed the signed Agreement to Plaintiff with a cover letter that stated:

> Jewell [sic] asked that you overnight the check to his house @ 1235 Michigan Ave. Apt. D41 Adrian, MI 49221. He does not have time to drive to Lansing. Thank you for all your hard work regarding this project. Jewel [sic] is very excited and happy to be getting his own home.
>
> Sincerely,
>
> Bryan Esterline

Exhibit 2 attached to Plaintiff's Response. That same day, April 24, 2003, Plaintiff paid $90,000 to Esterline Construction as an initial payment under the Home Modification Agreement. Plaintiff's Exhibit 5, Affidavit, ¶ 6. Additionally, Plaintiff's representative, Richard Rollis, states that Plaintiff would not have agreed to a proposal to construct a house that did not include provisions for the land on which the house was to be constructed. Exhibit 1 attached to Plaintiff's Response, ¶ 6.

On June 5, 2003, the Esterline Defendants sent correspondence to John Abraham, principal of Abraham Realty Company, regarding the McGowan project, in response to a threat by Abraham Realty to reject Esterline Construction's attempt to purchase the lot on which Mr. McGowan's house was to be built. Plaintiff's Exhibit 8. In that correspondence, the Esterline Defendants stated that they had sold the job to Mr. McGowan and Plaintiff by representing that the Esterlines already owned the property. The correspondence also states that Defendants were going to request that Plaintiff release a portion of the funds to give to Abraham Realty as a gesture of good faith. Specifically, Defendants wrote:

> I have received your fax regarding Carson Hwy. lot and note payments. Please do not consider my offer on Carson Hwy. null and void. I am trying to get the insurance company to release the $4,500.00 to give to you. **I sold this job to the client and insurance company with the idea that I had the property and the lot could be paid for at the end of the project.** I truly did not think the insurance company was going to accept the proposal for my client seeing that they were going to pay for the entire project. They did accept the proposal, which surprised me and also put me in a bind regarding paying you for the lot. **The insurance company has no problem paying for the lot when the project is complete. In the mean time I am trying to get them to release a portion so I can give that to you for good faith.** So again please do not consider my offer null and void. I have already ordered the house and received all my permits for construction accept [sic] the building permit. I'm sorry for the confusion by I know I can work it out.

(Emphasis added).

At the same time or at sometime shortly thereafter, the Esterline Defendants borrowed $18,110.88 from Abraham Realty, ostensibly for the purpose of making the final payment to the manufacturer of the modular home, who would not release the home until payment in full was received. Plaintiff's Exhibit 9, Promissory Note. According to the Promissory Note for the borrowed funds, the Esterline Defendants would repay Abraham

4

Realty on the note "in full upon receipt of draw on McGowan home, but not later than August 31, 2003." The Esterline Defendants did not repay the borrowed funds.

On November 24, 2003, Plaintiff made an additional payment of $25,000 to Esterline Construction, bringing the total paid by Plaintiff under the Home Modification Agreement to $115,000. Plaintiff's Exhibit 5, Affidavit, ¶ 7. At this time, Plaintiff was unaware that Esterline Construction had not purchased the lot on which Mr. McGowan's home was being constructed, or that Esterline Construction had obtained $18,110.88 in additional financing for the project from Abraham Realty. Plaintiff's Exhibit 5, Affidavit, ¶ 7.

In March 2004, Plaintiff learned that Esterline Construction had borrowed the additional $18,110.88 from Abraham Realty and that the modular home was substantially incomplete, despite representations to the contrary by the Esterline Defendants. Plaintiff's Exhibit 5, Affidavit, ¶ 11. Plaintiff demanded that the Esterline Defendants complete construction of the home and pay for the lot.

By facsimile dated March 29, 2004, the Esterline Defendants promised to complete construction by April 26, 2004, with final inspections to be conducted shortly thereafter. Plaintiff's Exhibit 10. By correspondence dated May 14, 2004, Plaintiff made demand upon the Esterline Defendants to pay for the McGowan lot, to pay off the promissory note owed to Abraham Realty, and to deed the property to Mr. McGowan, in accordance with the Home Modification Agreement. Plaintiff's Exhibit 11. Despite Plaintiff's demands, the Esterline Defendants failed to make the required payments or to complete construction of the modular home. Plaintiff's Exhibit 5, Affidavit, ¶ 13.

On May 26, 2004, in order to complete the project and to meet its obligations to Mr.

5

McGowan, Plaintiff paid $22,000.00 to Abraham Realty to purchase the lot for McGowan, and an additional $18,110.18 to pay off the Promissory Note, which was required as a precondition to Abraham Realty delivering title. Abraham Realty agreed to waive interest and bank charges in exchange for payment of the face amount of the note. Affidavit, ¶ 14. In addition, Plaintiff was required to pay a total of $24,853.81 to other contractors in order to complete construction of the home. Specifically, Plaintiff paid $102.00 on May 26, 2004, $11,000.00 on July 9, 2004, $7,226.08 on October 1, 2004, $5,380.33 on October 29, 2004, $572.80 on December 14, 2004, and $572.60 on December 17, 2004. Affidavit, ¶ 15. Of these amounts, approximately $1,400.00 was for work not included within the original Home Modification Agreement, and which was not the responsibility of the Esterline Defendants. Of the total payments required to complete construction of the home, approximately $23,460.68 was for construction work that Esterline Construction was required to perform under the parties' agreement but failed to do so. Plaintiff's Exhibit 5, Affidavit, ¶ 16. The total principal amount claimed by Plaintiff is thus $48,609.86, consisting of the $22,000 Plaintiff paid to purchase the lot, the $23,460.68 paid to complete construction, the $18,110.18 to pay off the promissory note, minus the contract balance of $14,961.00.[2]

On January 10, 2005, Defendants voluntarily filed bankruptcy under Chapter 7. On April 25, 2005, Plaintiff filed a Complaint opposing the discharge of Defendants' debt under § 523(a)(2)(fraud), (a)(4)(fraud of a fiduciary/violation of the Michigan Builder's Trust

---

[2]As referenced, *supra*, Plaintiff had paid the Esterline Defendants $115,000.00 of the 129,961.00 agreed upon amount.

6

Fund Act) and (a)(6)(wilful and malicious injury) resulting from Defendants' fraud, misrepresentation, and defalcation with regard to construction funds advanced by Plaintiff to build a home for a policyholder.

The Esterline Defendants argue that summary judgment cannot be granted because: (1) Plaintiff does not have standing to bring an action for breach of contract for violation of the Michigan Builders' Trust Fund Act, or for fraud, because Plaintiff was not in privity with Defendants; (2) Plaintiff is barred by the Statute of Frauds from bringing an action for breach of contract based on Defendants' failure to purchase the land when the proposal does not include any provision for the purchase of the land; and (3) Plaintiff does not have a cause of action under the Michigan Builders' Trust Fund Act when there are no allegations that any materialmen or subcontractors went unpaid.

II.

STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

7

(1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

III.

JURISDICTION

Bankruptcy courts have jurisdiction over all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11. 28 U.S.C. §§ 1334 & 157. Core proceedings include proceedings to determine dischargeability. *Id.* § 157(b)(2)(I). As this is a proceeding to determine dischargeability, this is a core proceeding under 28 U.S.C. § 157(b). Thus, this Court has jurisdiction over this matter.

IV.

ANALYSIS

A. There Is an Issue of Fact Concerning Whether Defendants' Debt to Plaintiff Is Non-Dischargeable under § 523(a)(2)(A).

Section 727 of the Bankruptcy Code provides that a debtor may obtain a general

8

discharge from all debts that arose before the order for relief. 11 U.S.C. § 727(b).
However, there are exceptions for certain obligations, including debts for money obtained
by fraud. 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) provides:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

To prevail on a claim under § 523(a)(2)(A), a plaintiff must show that: (1) [T]he debtor obtained money or a refinancing of credit through a material misrepresentation that *at the time* the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert),* 141 F.3d 277, 280 (6th Cir. 1998)(emphasis added).

This Court denies summary judgment under § 523(a)(2)(A) because, at the very least, there are issues of fact concerning whether Defendants obtained money through a material representation that Defendants knew was false or made with reckless disregard for the truth *at the time* the representation was made.

B. There Is an Issue of Fact Concerning Whether Defendants' Debt to Plaintiff Is Non-Dischargeable under § 523(a)(4).

Under the Michigan Builders' Trust Fund Act, a contractor doing business in Michigan is prohibited from retaining or using construction payments from a particular

9

project until all laborers, subcontractors, and materialmen have been paid. *People v. Brown*, 610 N.W.2d 234, 237 (Mich. Ct. App. 2000). In particular, § 570.151 of the Act provides that:

> Sec. 1. In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.

M.C.L.A. § 570.151.

The prima facie elements of a civil cause of action brought under the Act include (1) the defendant is a contractor or subcontractor engaged in the building construction industry, (2) a person paid the contractor or subcontractor for labor or materials provided on a construction project, (3) the defendant retained or used those funds, or any part of those funds, (4) for any purpose other than to first pay laborers, subcontractors, and materialmen, (5) who were engaged by the defendant to perform labor or furnish material for the specific project. *DiPonio Constr. Co., Inc. v. Rosati Masonry Co., Inc.,* 246 Mich. App. 43, 49 (Mich. App. 2001).

11 U.S.C. § 523(a)(4) prevents the discharge of a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The Sixth Circuit has held that the Michigan Builders' Trust Fund Act makes the contractor a fiduciary with respect to the funds paid to him by the owner so as to render the debt arising from the contractor's misapplication of those funds a defalcation under section 523(a)(4) of the Bankruptcy Code. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 252-3 (6th Cir.

10

1982)(The Building Contract Fund Act satisfies the express or technical trust requirements of section 17(a)(4) [the former § 523(a)(4)]). Furthermore, the Michigan Builders' Trust Fund Act does not require that materialmen or subcontractors go unpaid, only that contractors misappropriate construction funds. *People v. Miller*, 259 N.W.2d 877 (Mich. Ct. App. 1977)(Michigan Builders' Trust Fund Act applies to a situation where a contractor takes construction funds, does not hire contractors, and does not perform any work.)

Under § 523(a)(4), a defalcation occurs when a debtor misappropriates or fails to properly account for those funds held in a trust. *R.E. America Inc. v. Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir.1997), *citing Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 125 (6th Cir.1985). When a builder trustee files for bankruptcy, he has the burden of demonstrating that he properly managed all funds for the projects undertaken. *In re Little*, 163 B.R. 497, 503 (Bankr. E.D. Mich. 1994). If he cannot do so, then he is guilty of defalcation, and the trust fund amounts are non-dischargeable under § 523(a)(4). *See Kriegish v. Richard Lipan (In re Kriegish)*, 275 B.R. 838, 845 (E.D. Mich. 2002) ("[T]he beneficiary need not demonstrate financial irregularities at all. Instead, the beneficiary need only prove the existence of a fiduciary relationship, and then demand an accounting."). The standard does not require a showing that the debtor acted intentionally, although a showing of mere negligence is insufficient. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 255-57 (6th Cir.1982).

Here, the Court holds that Plaintiff's Complaint states a cause of action against Defendants under the Michigan Builders' Trust Fund Act. Plaintiff paid Defendants $115,000 to build a modular home on a lot which Defendants had represented they owned. The home was not completed, the land on which the home was to be built was not owned by Defendants, and Defendants had borrowed money from the owner of the real property, resulting in a lien against the real property. There is an issue of fact as to whether Defendants misappropriated Plaintiff's funds and used them for purposes other than construction of the McGowan house. Under the Michigan Builders' Trust Fund Act, Plaintiff is entitled to an explanation as to how the $115,000 paid by Plaintiff was spent. The Court is unsure whether Plaintiff has requested an accounting. Therefore, summary judgment is denied for the limited purpose of allowing Defendants to produce an accounting in support of their contention that no funds were misappropriated. If an accounting is not produced by July 14, 2006, this Court will draw the inference that such an accounting would not support Defendants' position and will GRANT summary judgment in favor of Plaintiff under § 523(a)(4), finding that Defendants debt to Plaintiff in the amount of $8,499.68 for failure to complete construction is non-dischargeable. (This amount is comprised of the $23,460.68 Plaintiff paid to complete the construction minus the contract balance of $14,961.00).

C. As a Matter of Law, a Portion of Defendants' Debt to Plaintiff Is Non-Dischargeable Pursuant to § 523(a)(6).

Section 523(a)(6) states:

(a) A discharge under section 727,1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

    (6) for willful and malicious injury by the debtor to another entity or to

12

the property of another entity;

In other words, debts resulting from "willful" and "malicious" injury are non-dischargeable under § 523(a)(6).

The Supreme Court has held that an injury is "willful" under § 523(a)(6) if the debtor desired to cause the consequences of his act or if the injury was substantially certain to result. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 646 (6th Cir. 1999). Courts have held that an injury is "malicious" if it results from acts "in conscious disregard of one's duties or without just cause or excuse." *Trantham*, 304 B.R. at 308. A malicious act "does not require ill-will or specific intent." *Id.* The *Geiger* Court rejected a broader construction of § 523(a)(6) that would make debts from intentional acts that cause unintended or unanticipated injuries non-dischargeable in bankruptcy. *Geiger*, 523 U.S. at 62.

In this case, this Court finds that Defendants entered into a contract to build a barrier-free home on a specific piece of property and deliver the home *and the property* to Mr. McGowan in exchange for payment of $129,961.00 from Plaintiff. Plaintiff's Exhibits 5, 6, 7 and 8; Exhibits 1, 2 and 4 attached to Plaintiff's Response. This finding is supported by the facts that: (1) although Defendants' proposal did not reference the purchase of the property, and Defendants did not sign the Home Modification Agreement, Defendants' June 5, 2003 letter to Abraham Realty shows that Defendants must have indicated to Plaintiff that they already owned the property or, as part of the negotiated price, would obtain the property (Plaintiff's Exhibit 8; Plaintiff's Exhibit 5); (2) Defendants were familiar

13

with the terms of the Home Modification Agreement (which included a requirement "to purchase lot #1) and even arranged for Mr. McGowan to sign the Agreement (Plaintiff's Exhibit 2 attached to Plaintiff's Response; Plaintiff's Exhibit 1 attached to Plaintiff's Response); and (3) Plaintiff's representative, Richard Rollis, asserts that Plaintiff would not have agreed to a proposal to construct a house that did not include provisions for the land on which the house was to be constructed (Plaintiff's Exhibit 1 attached to Plaintiff's Response, ¶ 6). Therefore, this Court finds that Defendants acted "wilfully" when they did not obtain title to the property, because by failing to obtain title to the property, they knew "injury" was substantially certain to result; that "injury" being either the loss of Plaintiff's investment in the structure on the property or the requirement of further expenditures to clear title.

Additionally, Defendants' failure to obtain title to the property was "malicious" because it was done without just cause or excuse. Defendants promised to purchase the lot and build the barrier-free house. Defendants argue that the proposal to build the house does not require Defendants to purchase the land. While this is true, it defies reason that Plaintiff would contract with Defendants to build a house on a piece of property which Defendants did not own. The Court finds that Defendants, while not signatories to the Home Modification Agreement, were well aware of its term requiring the purchase of the lot, in light of the fact that the Esterline Defendants faxed a copy of the Agreement to Plaintiff (Exhibit 2 attached to Plaintiff's Response) and the fact that on the same day the Home Modification Agreement was signed, Defendants received payment of $90,000. This Court finds the explanation of events as set forth in the Rollis affidavits credible and

14

disregards the assertion by Defendant Bryan Esterline that the contract price did not include the land as self-serving and contradicted by the letter Defendants wrote to Abraham Realty seeking an extension of time in which to buy the real estate.

In summary, this Court finds that Defendants' debt to Plaintiff for failure to provide title to the property upon which the house was built is non-dischargeable under § 523(a)(6) in the amount of $40,110.18. (This amount is comprised of the $22,000.00 Plaintiff paid to purchase the subject lot plus the $18,110.18 Plaintiff paid to Abraham Realty to pay off Defendants' promissory note so that Abraham Realty would deliver title to Plaintiff).

D.      Defendants' Arguments Are Not Persuasive.

The Esterline Defendants argue that summary judgment cannot be granted because: (1) Plaintiff does not have standing to bring an action for breach of contract, for violation of the Builders' Trust Fund Act, or for fraud, because Plaintiff did not contract with Defendants for the purchase of the land; (2) Plaintiff is barred by the Statute of Frauds from bringing an action for breach of contract based on Defendants' failure to purchase the land when the proposal does not include any provision for the purchase of the land; and (3) Plaintiff does not have a cause of action under the Builders' Trust Fund Act when there are no allegations that any materialmen or subcontractors went unpaid. The Court rejects each of these arguments.

First, Plaintiff does have standing to bring this action because this Court has found that Plaintiff did contract with Defendants for the purchase of the land. Second, the Statute of Frauds does not apply in this case because this case does not involve the enforcement

of an interest in real estate. Defendants agreed that, for a price, they would build a barrier-free house on a lot that they already owned and deliver it to Mr. McGowan. Third, Plaintiff has a cause of action under the Michigan Builders' Trust Fund Act because a violation under the Michigan Builders' Trust Fund Act does not require that materialmen or subcontractors be unpaid. The Builders' Trust Fund Act merely requires a finding that Defendants misappropriated construction funds without actually performing the work.

V.

CONCLUSION

For the reasons set forth above, this Court GRANTS summary judgment under § 523(a)(6) in favor of the Plaintiff against Defendants in the amount of $40,110.18 for failure to obtain title to property upon which it built a home paid for by Plaintiff.

This Court further orders that Defendant provide an accounting of the disposition of all monies provided to it by Plaintiff by July 14, 2006 for purposes of determining whether the remaining portion of the debt relating to the completion of the construction, totaling $8,499.68, is non-dischargeable under § 523(a)(4). If such an accounting is not provided by July 14, 2006, this Court will enter an order granting summary judgment in favor of Plaintiff under § 523(a)(4). If such an accounting is provided, and if it raises issues of fact, this Court will hold an evidentiary hearing on July 25, 2006 at 2 p.m. on whether the $8,499.68 is non-dischargeable under § 523(a)(2)(A) and § 523(a)(4).

**Entered: June 28, 2006**

                                          **/s/ Marci B. McIvor**
                                    **Marci B. McIvor**
                                    **United States Bankruptcy Judge**